Case 18-1917, Speech First Inc v. Mark Schlissel et al., argument not to exceed 15 minutes per side. Mr. Consovoy, you may proceed to the appellant when ready. Good morning. May it please the Court, Roe Consovoy, appearing on the item Speech First. On appeal, the University of Michigan does not defend, or barely defends, the definitions that have been challenged in this case. That is the definition of bullying, that is the definition of harassment, that is the definition of biased incident. Instead, the University has done what so many government defendants have done when faced with a similar case like this. They scrub the record, they claim this is all a big misunderstanding, and hope to escape the case without a finding that it acted illegally. But neither this Court's precedent, nor the precedent of the Supreme Court, permits the case to be dismissed so easily. Turning first to the issue of mootness on the challenge to the bullying and harassment policy. The District Court held that the case was moot because of voluntary cessation. But under this Circuit's precedent, like A. Philip Randolph in cases like Tree of Life, in cases like Acres, and in so many Supreme Court cases, including most recently Trinity Lutheran, informal changes such as this are not sufficient to meet the absolutely clear standard that has been set forth to moot a case when the behavior has been ceased voluntarily. And all the University did here, all they did, was click a few buttons on a website and delete definitions. Tomorrow morning, the University could wake up, decide that it was a huge mistake for reasons of their own, for reasons of change in administration, for reasons of public pressure, and revive all of those policies. And in so doing, would leave the plaintiffs here at their mercy. That is why the Supreme Court has said the only time you can get voluntary cessation for a government is when there is a structural change that is durable, such as legislation. That is the point in cases like City of Mesquite. That is the point, most recently, in Trinity Lutheran. And it's certainly the case in A. Philip Randolph. And I would ask the court to approach the question like this. If the University of Michigan, or let me put it the other way, if the governor of Missouri, Trinity Lutheran, did all of the things that the University of Michigan did here, and they're all basically the same, an 11th hour change, a statement that they see they were in error, if they did all of that and simply added one small additional piece, which instead of putting it in a letter to the Supreme Court of the United States, they put it in a declaration, would that case come out differently? I don't see how the answer is yes. I don't think – Let me interrupt you for a second and just express a small measure of concern that I have about how far you're taking this issue of solicitude when there is a case involving a governmental entity. And here there's no question the University of Michigan is a governmental entity. It's set out in the Constitution. It's a constitutional body, whatever that means. It doesn't act by legislation. It doesn't pass laws. So to say you only get voluntary cessation only works if there's a – it could only be resumed by virtue of a legislative change simply takes it away. It just abolishes that whole doctrine in connection with governmental agencies, which seems opposite of the way it should be with governmental agencies. So I think that's a fair point in terms of they don't act legislatively. I would draw a couple points of response. First, there is a more formal process available to the university. They could have amended the statement itself. That is done every few years. That is required to be put out for comment, required to be brought to the president, a much more formal process. What I thought you were probably going to say is they could have gone to the Board of Regents and taken it in a public meeting and debated it and memorialized that in minutes because that's harder than for the regents, I suppose, to change their mind. But that isn't the argument you're making. I would make both. I think actually what I'm suggesting is more in line with what the Supreme Court is looking for. Why legislation gets the most benefit is not because of the moniker of legislation but because it creates a structural barrier to change back. And so why I'm pointing to the more formal process is it, like legislation, would create that structural barrier. I think a good example here, though, technically, are the prison cases. So the same argument point is made here about, well, they don't act through legislation. You can make it about prisons. Yet we see prison cases on both sides of this line. Akers is a prison case where it was a more informal process like this one, and it was held not to be the case. Whereas in Hanrahan, the prison case my friends rely on, they did take a more rigorous regulatory approach to changing the policy. And there it was found that they did earn the solicitude and they were able to move the case. And so it is not just legislation. I think legislation is the paradigmatic, durable, structural change that moves a case. But you have to look. And if the answer is, well, the university can't do that, then the university can't win movements. The university cares, the burden. This is a question of them trying to defeat our claim, not us trying to bring our claim. Well, you've conceded. It might be enough if the Board of Regents were the decision maker. I would not say I conceded. I would say – That'd be better. It's closer. What if you go down the hierarchy? What if the president – what if this goes to the president instead of a dean of students and the president says, yep, that's our new policy and we need it and we're going to stick with it? No. Not enough? No, Your Honor. And here's why. The question is what has to happen to bring the policy back, not what kind of window dressing you put on your decision to stop. In legislation, constitutional amendments even better. Those cases are even stronger. The issue is not what you did to eliminate the policy, but what would be required to bring it back. There you have to – even in a constitutional amendment, you would have to go to the people. In a statute, you would have to get the entire legislature to agree. That also, obviously, on a practical level, creates an opportunity for a plaintiff to not get whipsawed because they'll see it coming and could bring a new case. That's – and when we get to these informal behaviors, the two biggest problems are that there's no impediment to restoring the policy. And while I understand that the university took this change to the president and showed it to a lot of people, got everybody to sign on. The fundamental factor is on change, which is all it takes is one person to change their mind, to put it back on the website, and it's back. Is this issue on the definitions and whether that challenge is good? Is that more important to you than the question of standing on the bias response team and the other part of it? They're both important, and I would like to turn to the bias response team if I might. They're equally important to us, and I think they're both emblematic of a misstep by the university. We'd just like to read things into it. Which one do you start with? That's all. I started with – I took the district court's opinion in order is what I've done, but I think they're both equally strong. I think we have a very strong case that the bias response team creates the kind of objective chill that leads to a First Amendment claim. And I think the way you would approach this case is look from the reasonable student's perspective. They say, oh, go say these unpopular things on campus. But someone – anyone can report you as engaged in a biased incident that gets reported and maintained by the university, potentially in perpetuity. You may get contacted. You are labeled an offender. What you have done is called to be akin to a hate crime. What do you mean by you're labeled as an offender? Where are you labeled as an offender? On the website, on the materials, when they talk about this bias response team – and it's in the record, Your Honor – they say people who commit these acts are called offenders. And you should report the offender and the person – and the people who are the object of the situation. But all of this is an accusation, and your name isn't attached to it. So your name is attached, not in the public sanitized version that goes out, but in the report to the university. Your name is attached. That is a record that is maintained by the university. And we do not know what is ultimately done with those records and whether down the road – how that – they say they maintain privacy, but we don't know what that means. If an employer were to request your record, if anybody, that report is in there. And the question is, if the university wants to defend this program, like the University of South Carolina did, if added under the First Amendment and say it can withstand strict scrutiny, that is an argument we are prepared to have and we think we will easily win given the definition of bias incident. But the point I would like to really drive home is that's not the university's principal argument. The principal argument is this is not an enforcement regime that is even subject to the First Amendment. Now, if you want to assume that something appearing in a record, the possibility of that happening could then be an object of chill. Do we know enough yet at the stage of this case as to how the university keeps records relative to students and where are they and how they're linked together? We know all the grades go to one spot and the registrar has that and you get a transcript. But within the university, then if an employer asks, I want to know everything about William Consvoy, is there – do you have any reason to believe that if a bias report had been – a claim had been filed with respect to that student that that would be revealed to somebody asking? I know I'm going to run out of time, but if I could briefly respond. We'd like to know more, but the question is – and I think this is the key to it – the student doesn't know either. The student has to make an ex-ante decision whether to speak. And without knowing what – they know there's a report, they know there's a record, they know there's a bias response team that could invade their life. The question is are they objectively chilled by knowing that and are we likely to succeed on that claim? Of course we'll be – even if we're found to likely succeed, there will be discovery and the university can maybe launch evidence. Would it matter if the policy – I'm just making this up – said that if an incident was determined not to be a violation of university policy, the record and the complaint would be destroyed? Would that make a difference? It is because this is a totality of the circumstances kind of market issue. And so, yeah, it would be less harmful. I think the reporting itself would have some chill. You'd still have the intervention issues. You'd still have the definition of bias incident, which even the university can see. And if I can just very quickly make one final point before I sit down. We have used this example of the patriotism response team at every step of the case. And we say if they can have a bias response team that has a definition of bias incident, that has somebody who can come check and make sure you're not biased and report bias, they can do the same thing on patriotism. And we have not heard – On what? Patriotism. So, you've got a patriotism response team at a university. And the university can make all these same arguments and say it's not government action. We just care about patriotism. We're going to come visit you and talk to you about your lack of patriotism. And you can report a patriotism bias or patriotism incident. We have not heard anybody from my friends say that's incorrect. Is it your understanding that the court made the decision based on the preliminary injunction factors, basically a likelihood of showing standing, a likelihood of showing mootness, etc., or that this is it? Unclear, to be candid. I think likelihood. Certainly, on the other factors, the merits was driving the analysis on irreparable harm, on the balance of equities. I think on the voluntary cessation, it looked more definitive because it was about the law. And we just think, for the reasons I've given, that the district court erred legally in understanding how that doctrine functions. On the bias response team, there was statements about insufficient evidence and things of that nature. We don't – we think the key evidence here is the nature of the policies because that's what the student gets to see when they have to make a choice about whether to say unpopular things or self-censor. But I think to be candid, Judge White, it's unclear on the second one. Thank you. May it please the court. My name is Kevin Mannion. I represent the University of Michigan. There is no live controversy between the University of Michigan and any of its students. If there were, you would expect that there would be some testimony from a student who feels aggrieved for perhaps some evidence in the record that some student has been threatened or disciplined for engaging in the kind of speech that students A, B, and C say they want to engage in. The record here is the opposite. The student that violates of these constitutional rights are to be an objective of juror. That's the whole reason we use an analysis of juror. Well, there has to be some evidence in the record that would support the conclusion that these anonymous students face some credible threat of enforcement. This case is really on all fours with the Morrison case. What if they're not engaging in this conduct, which is obviously your ultimate objective? What if they're not engaging in this conduct because there's an objective of juror, but they have a constitutional right to engage in the conduct whether you want them to or not? Well, the conduct at issue here is engaging in open and robust intellectual debate on the controversial subjects that have been identified in the complaint. No student at the University of Michigan has ever been subject to discipline or a threat under these policies for engaging in that kind of speech. In the Morrison case, this court could not have made more clear that a mere allegation of subjective chill does not establish standing unless there is some evidence in the record that would lead to the conclusion that there is a threat of imminent enforcement against that particular student. In that case, exactly as in this case, a school had a policy against harassment. The plaintiff challenged the policy, and the court said there's no standing here because there is no evidence that any enforcement is incurred or is imminent. And there is no exception for overbreadth. The court in that case, as in the prime media case, said there's no exception of overbreadth to standing. Even if you are alleging a regulation is overly broad, you must still establish that there is a credible threat that you are going to be disciplined or subject to some kind of enforcement action. And then if you can establish that you are exposed to concrete harm because of the imminent threat of enforcement against you, then you can also raise other people's arguments. But first, you must establish some kind of action by the defendant that raises the prospect of imminent threat of enforcement against you. And in this case, there is not only an absence of evidence. There is affirmative evidence that there is no threat. There are four affidavits in the record that establish both as to the harassment policies and as to the VRT policies that there is zero threat that these students will ever be disciplined, will ever be called before the biased response team for expressing their views on immigration, on abortion, on the other subjects that they wish to engage in serious intellectual debate on. Let's go back just a second. If this case came about when the University of Michigan had announced it was considering setting up this system, hadn't set it up, hadn't done anything, hadn't put any definitions on the policy or website, I would understand better your argument. But here, they've set it up and they've established a statement. They've put things on the website. And my understanding is – and I won't get this number exactly right – there have been a number of these alleged biased actions occurring that have resulted in being memorialized in this law. Am I right so far? Sixteen. There's a law and there have been biased reports, yes, Your Honor. But there is no evidence. And it's 16 or 17 over the course of however long. No, no. You're confusing two things. Sixteen harassment disciplinary proceedings of one sort or another. There is – Oh, wait. Follow me along. I'm just trying to take little baby steps. Right. So you set it up. You've had 16 or 17 complaints that the dean of students or this group has acted upon. They've listed these complaints and however you memorialize this in the university. What do you mean? You have a log. You have a log. You've sent it to us. There is a log. I don't want to get hung up on the details. So if I don't say it exactly correctly, bear with me at least for a minute until we get to the bigger point here. So some things have happened. Now, you seem to be saying that in the face of all that, some student has to actually be called out and disciplined before that student would – or the association that represents it would have stand. Is that your argument? No, no. That's not my answer. Okay. No. There has to be a credible threat of imminent enforcement against you. And they could establish that in a number of ways. But there doesn't have to be actual enforcement against you. You can have standing if you can show evidence in the record establishing that you face an imminent threat of disciplinary action. But let me clarify this idea of 16 cases. Do you have to face an imminent threat of disciplinary action or do you have to be able to show that there is an objective belief that your speech is being chilled? The objective belief that your speech is being chilled is based upon the evidence that you would face the prospect of enforcement if you engage in a speech you wish to engage in. On serious subjects. And there has never – there is no evidence in the record at all of any enforcement action, threat of enforcement action, or report to the bias response team based upon the expression of a serious point of view. I think you're making – so to be clear, I'm thinking I'm hearing you limiting these helpful statements to students who are doing what we love to see them, salutary kinds of things at the university by having robust, serious debate. The issue we're talking about here is I'm thinking more about saying something insulting to a roommate and that it's politically incorrect. And the feeling of your speech being retarded in all respects under your First Amendment rights because thou shalt not. Okay. Is it something you're actually distinguishing between those two things? You can have this response team contact you by virtue of saying some inappropriate kind of thing to a friend. It may not be in a class. It may be in the lunchroom. Is that different than what you're… Your Honor, when I talk about standing and I'm covering both the bias response part of the case and the harassment and bullying part of the case, the plaintiffs must establish that they wish to engage in some conduct that can reasonably be expected to be the subject of some kind of action. And they don't claim that they want to harass a roommate or say something insulting to someone. They said they want to engage in intellectual debate, and there is no prospect of any report of any kind resulting in any action based upon engaging in that kind of debate. There's no evidence in the record that anyone has ever been hauled before any committee for doing what the plaintiffs say they want to do. Okay. That's your point, narrowing it to how they've couched it. I'm saying that there actually has to be back-end discipline in order for you to have standing because I thought we were trying to figure out whether this initial contact that the university might have of an allegedly offending student, because that's what you call it in policy, whether that alone is a sufficiently objective shield to have student standing. The mere possibility that a member of the bias response team might make a call or send an email to a student and invite that person to participate in a voluntary discussion that cannot result in discipline does not give rise to standing, especially when there is no reason to think that that would ever happen based upon the expression of a viewpoint on the subjects that the plaintiffs list in their complaint. The bias response team can make a referral to somebody that will then impose concrete action. There's no evidence. So what is it – other than it hasn't happened, that's a good argument. What is it about this case that would assure this reasonable student that your fellow counsel was talking about earlier that this isn't going to happen? The affidavits in the record, uncontradicted, never subjected to any challenge by cross-examination or any other way, the affidavits of four university officials, two of whom say explicitly no student will ever be disciplined under these policies for expressing any viewpoint on any controversial subject, including the subjects articulated by the plaintiffs in the complaint. Now, that's an assurance that assuredly came in the course of the lawsuit, but before the lawsuit was filed, there was no prospect of that ever happening. It has not happened. We don't even have students before us who are willing to say – I personally, under oath, by the way – willing to say, I'm afraid. All we have is an allegation drafted by a law firm. They won't even come in and submit an affidavit saying what they want to do and why they feel chilled in the exercise of that. And it's not just the Morrison case. There are multiple cases in this circuit and other circuits that say merely coming in and saying, I feel chilled, I am worried, is not enough. You have to establish some kind of evidence that would give a core basis to say that there is a concrete harm that's required for constitutional standing. And merely saying, I'm afraid, is not concrete harm. Now, we've talked a little bit about the bias response team, and I'd like to address that very briefly. The bias response team has no enforcement mechanism. Exactly once in the period of time covered by this complaint has a student even come in to talk to a representative of the BRT because the BRT representative is such a low-level person that most students feel free to ignore her, and they do. One person came in to have a conversation, and the conversation went like this. The student had made fun of a fellow student's English-speaking ability, and the person said, I'll agree to come in and talk about it, and they talked about it. And the BRT person said, you're not in trouble. You have the first right to say what you said. But the student was offended. Have you considered that? And the student said, you know, in thinking about it, I probably should have said what I said. I get it. That is not an unconstitutional interaction between a university and a student. That is an appropriate interaction between a university and a student. at this stage in the case, that the reason the other 15 people didn't take up this offer and come in is because on the one hand, as you say, this is a low-level bureaucrat that can't do anything to the student, which is the university's position. Or on the other side of the coin, it seems to me it's arguably reasonable to say that they're afraid of what would happen if they did come in. So they don't blow it off because it's unimportant. They don't come in because they're afraid. How do we know that? If they don't come in because they're afraid to come in and that's the end of the matter, then what's the problem? They are told they don't have to come in. It's voluntary. And so that – an invitation to a voluntary meeting, which is declined. Let's assume that the complaining party knows the identity, the name of the, as the policy says, the offender. All right? Now, the bias response team calls the person you've categorized as an offender and says, here, we've got this complaint. Would you like to come in? You don't have to, but would you like to come in? The person says no. Now, how do they know with any assurance that that's the end of it when the bias response team can refer that to the authorities that do have disciplinary powers, even if, as I said before, the complaining party doesn't wish that – doesn't want to go that far? Well, even if there were a referral, there's no evidence that there would ever be anything done with it. If it's just engaging in the kind of pure speech that plaintiffs want to engage in. But the assurance is that the website says it's voluntary. You don't have to come in. The website says the purpose is only educational. It's not disciplinary. And anybody can make a referral at any time. The BRT doesn't have to exist for the student to be able to go to the Office of Student Conflict Resolution and make a complaint. But then there's a determination at the outset of every case whether or not the speech is possibly prohibited or there's protecting. And the reality is that the Office of Student Conflict Resolution's first determination would be, is this protective speech? Because it's not end of case. And so there's always a threat that someone can report someone for anything. But the university policy is not to pursue discipline against the expression of viewpoints on controversial issues. They've reassured that. These students, student groups, and outside speakers have been expressing their views on exactly the issues that the plaintiffs say they want to express without any fear of retribution of any kind. That kind of exchange is welcomed by the university. The student groups that foster the varying opinions that students A, B, and C profess to have have university recognition and access to university space and facilities. Have you read President Shishol's public statements about some of these speakers when you say it's so blithely that the university welcomes these speakers? They might have ultimately allowed you to come, but have you maybe gone a step or two a little farther? The university's policy is to welcome all speakers, Your Honor. And you think that even the most controversial – Do you think the president's comments in the press reflect that welcoming nature? You know, I'm not even sure what comment you're referring to, Your Honor, so I really can't say. But there is no evidence. You can Google it when we're done and you're about to get it. Let me just make one last point that I think is responsive to a number of the comments from the bench. It is not our burden to establish the absence of a showing of a preliminary injunction. It's the plaintiffs' burden. And the most striking thing about this case is that it produced no evidence. They chose not to cross-examine any of our witnesses. And so the only evidence as to how the biased response team operates, as to how the Office of Student Conflict Resolution operates, is the unchallenged testimony of university officials. The plaintiff has not come close to establishing a likelihood of success. And if one thing is perfectly clear on this record, it is no threat of imminent harm that justifies a preliminary injunction. Thank you. Thank you. Judge McKee, you asked me that you take some cues by what I talk about as to what I care about. The University of Michigan today has spent almost its entire argument arguing the one point that Fischer-Ford said they were wrong about. Very little about voluntary cessation. Can you speak louder? I'm sorry. I'm sorry. At the end of your sentence. I apologize. The university has focused attention on one issue that the district court said they were wrong about. They were asking for affirmance primarily on alternative grounds. And this is on this issue of whether we have standing to bring these First Amendment claims because there's not a credible threat of enforcement. Judge Cook, my brother spent much of his argument talking about your opinion and Morrison. I think Morrison's great for us. The key question in Morrison's, I read your opinion, is whether the face of the statute arguably covered the speech that the student wanted to engage in. There the answer was no. There the policy was objective. There the policy was based on a reasonable observer. And at that juncture, as I read your opinion, the burden split. When the face of the policy doesn't cover your speech, then you do have a heavy burden to show of something going on on the ground that would lead you to think your speech was being prohibited because you can't see it in the face of the policy. Our case is the entire opposite. The face of these policies clearly and almost indisputably cover our speech. At that point, the Supreme Court has made clear. Don't you need to have some – for your standing, don't you need to show something more than the existence? In other words, some – the argument is not one student, nobody. Nobody's griping, just your firm. So the answer is you do need something more, but it's quite different than the way it has been characterized. Okay, what do you need and do you have? What you need is to show that it's not wholly speculative, that the statute has not been effectively repealed through nonuse. And let me be clear about this. Not with respect to your particular speech, but whether the policy is instilled in effect. So what you do in cases when you're covered – and this is in footnote 9 of the Abbott opinion from Judge Harris and the Fourth Circuit as well. What you look for then is, okay, is my speech covered by the face of the policy? Check. Is the statute still in use or is it destitute is the word that this court has used. When you say, is my speech, that would be a student? Yes. All right. Our students – so our – the president of speech – we have a complaint. The president of speech first submitted a declaration in support of the preliminary injunction. It identifies the kind of speech our members want to engage in, and the district court held. And my friends do not dispute that they accept those assertions. Just like we've accepted their declarations, they have accepted ours. So at this juncture, the court has to accept that our students want to engage in political, social, cultural speech that, under the definitions that we're challenging – harassment, bullying, bias incident – are clearly covered. How could they not be? Those definitions, which is a issue that we didn't want to talk about today, are completely subjective based on the recipient's own feelings. So there's no dispute, unlike in Morrison where the policy was objective and the student had an idiosyncratic concern about their speech being chilled. So in that case, that student has a very heavy burden, and your opinion says that student couldn't meet it. Here we have an incredibly light burden because think about the alternative, Your Honor. Imagine tomorrow the state of Ohio took the same policy and put it in the criminal code. Same policy. Under the university's position, we have to wait and see for years to see who they enforce it against, who they don't, instead of being able to bring a pre-enforcement challenge to court. There is no case that supports the idea, as Judge McKee put it, that a student has to take the risk, roll the dice, and hope, as Judge Wilkinson said in a case that was set in her paper, that the practice is what I hope it would be and not what the face of the statute says it is. Sorry, last thing. I know my time is up. Judge, do you have a question about where they say offender? It's on page 9 – the citation is on page 9 of the record. Unless the court has any further questions. Anything else? No, thank you.